237 N.J. Super. 282 (1989)
567 A.2d 598
JAMES WILKERSON, PLAINTIFF,
v.
C.O. PORTER MACHINERY CO., COPCO, INC., A SUBSIDIARY OF TANNEWICZ, INC., STARMARK INDUSTRIES, INC., JOHN DOE I AND JOHN DOE II, DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided June 30, 1989.
*284 Francis J. Dooley for plaintiff.
Martin B. Wallerstein for defendant (Di Rienzo, Wallerstein & Fellman, attorneys).
WECKER, J.S.C.
Defendant COPCO, INC. ("COPCO") seeks summary judgment on this products liability claim on the ground that it did not manufacture the radial saw that caused plaintiff's injury. Defendant admits it purchased assets of the actual manufacturer, C.O. Porter Machinery Co. ("C.O. Porter") in bankruptcy and continued to produce a similar model saw. However, COPCO argues that New Jersy's successor liability doctrine, as set forth in Ramirez v. Amsted Industries, Inc., 86 N.J. 332 (1981) and its companion case, Nieves v. Bruno Sherman Corp., 86 N.J. 361 (1981), does not apply.
Defendant seeks to avoid the Ramirez successor liability principle based upon a factual distinction between this plaintiff's circumstances and those of the claimants in Ramirez and Nieves. The question is whether this distinction makes a *285 difference. The issue is one of first impression in New Jersey.[1] The factual distinction is that the sale of assets here was a sale in bankruptcy. The accident and injury for which plaintiff seeks recovery occurred after the asset sale and the bankruptcy order approving the sale. For reasons detailed below, I find that the bankruptcy sale makes no legal difference, and defendant COPCO is not entitled to summary judgment on this ground.
C.O. Porter filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C.A. § 1101 et seq., on March 1, 1983. On February 28, 1983, an agreement for the sale of most of the manufacturing equipment and related assets to defendant COPCO was executed.[2] That sale was approved in an order of the bankruptcy court in the western district of Michigan on April 25, 1983. The order confirming the sale provides, in part:
The property is sold free and clear of all liens, claims (absolute or contingent) and encumbrances, with the interest of any parties asserting liens therein and claims and/or encumbrances thereon attaching to the proceeds thereof with the same validity and in the same order of rank and priority as said liens, encumbrances and claims now exist in said property.
*286 On May 2, 1985 a debtor's amended plan for liquidation[3] was confirmed[4] and on March 5, 1987 an amended order closing the case was signed. C.O. Porter did not survive the bankruptcy and its dissolution is set forth in the order closing the case. The plan provides also that "confirmation of this Plan ... shall constitute complete settlement with creditors and interest holders, except as to payments called for by this Plan."
On August 13, 1984, plaintiff James Wilkerson ("Wilkerson") injured his hand while operating a cross-cut saw on the job. That saw had been manufactured by defendant C.O. Porter in 1974. It eventually came to be owned by plaintiff's employer. The saw on which plaintiff was injured was C.O. Porter's model 47-A-36. COPCO has continued to manufacture and sell what is admitted to be the same model, 47-A, and offers it in three different sizes: 20", 30", and 36". COPCO was incorporated in 1983. Its sales brochure advertises the saw under the COPCO name as follows:
*287 A DESIGN PROVEN OVER 40 YEARS.
Its literature further states:
Over 40 years of on-the-job service in plants throughout the country have proven the Hydracut 47-A to be the best hydraulically-controlled cut-off saw design in the industry.
In order to analyze defendant's claim, the claimed distinction must be examined carefully. On the obvious level, one can find that a potential claimant with a non-existent injury, who could not be notified of the bankruptcy proceeding, cannot be precluded from seeking a remedy by such orders. See, e.g., Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, 943 (3 Cir.1985); Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.), 730 F.2d 367 (5 Cir.1984); In re UNR Industries, Inc., 29 B.R. 741 (N.D.Ill. 1983), app. dism., 725 F.2d 1111 (7 Cir.1984) (denying application to appoint nominal legal representative for unknown future asbestos victims to bind those victims in present bankruptcy proceeding). In Schweitzer, the circuit court distinguished a tort claimant from a plaintiff on a contract, who "bargain[ed] for a legal relationship with that debtor...." 758 F.2d at 943. But see, e.g., Conway v. White Trucks, 692 F. Supp. 442, 455, n. 9 (M.D.Pa. 1988) (trucker's accident occurred after the manufacturer's reorganization and asset sale in bankruptcy, but before the deadline for filing claims against the debtor-manufacturer).
That is perhaps too simplistic. The real question is whether the product-line theory of successor liability as carved out in Ramirez is so narrow as to exclude (and immunize) a purchaser of assets in bankruptcy. In other words, is there anything about a sale of business assets in bankruptcy that warrants greater protection from subsequent products liability claims than a purchase in a non-bankruptcy setting?[5]
*288 The mere fact that the bankruptcy order approves a sale purporting to transfer assets free and clear of various claims, even including contingent products liability claims, should not be determinative, as further discussed below. In Ramirez a purchase agreement that expressly denied the purchaser's assumption of liability for products claims that might be asserted against the manufacturer-seller was held not controlling. A bankruptcy order approving a sale of assets is intended to assure that assets are not being sold for less than fair market value, thereby depleting the estate to the detriment of its creditors. It has been argued that subjecting a sale of assets in bankruptcy to successor liability will devalue the bankrupt's estate and unfairly favor contingent claimants over other unsecured creditors. The New Jersey Supreme Court in Ramirez recognized and disposed of this argument, concluding that since the assets of the selling manufacturer were subject to the very same contingent claims, recognition of successor liability creates a more accurate market value for the assets. 86 N.J. at 353-355.
Ramirez adopted the "product line" exception to traditional successor liability law for certain products liability claimants who would otherwise be without a remedy.
[T]he general principle has been accepted in New Jersey that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct." Menacho v. Adamson United Co., 420 F. Supp. 128, 131 (D.N.J. 1976) (applying New Jersey law); (additional citations omitted). However, there are four established exceptions to the general rule of corporate successor nonliability in asset acquisitions. Under the traditional approach the purchasing corporation will be held responsible for the debts and liabilities of the selling corporation, including those arising out of defects in the latter's products, where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction *289 amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities. [Id. 86 N.J. at 340.]
Our Supreme Court chose to follow California and abandon
the traditional rule and its exceptions, utilizing instead the policies underlying strict liability in tort for injuries caused by defective products. [Id. at 347.]
To determine the scope of Ramirez requires examination of the "threefold justification" of the California Supreme Court decision that originated the "product line" theory of successor liability, adopted by the New Jersey Supreme Court in Ramirez, supra, 86 N.J. at 349. See Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977). The first justification is:
the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business.[6] [136 Cal. Rptr. at 580, 560 P.2d at 9; emphasis supplied.]
Unless the bankruptcy was brought on by a creditor who then purchased the assets, one might conclude from the literal language that a bankruptcy sale could never support successor liability. On the other hand, one must ask whether the courts in Ray or Ramirez focussed on the specific purchaser's role or whether they assumed that any transfer of a manufacturing business (or all of its assets) by definition destroys a products liability claimant's remedy against the manufacturer.
In other words, in the phrase "caused by the successor's acquisition of the business," is it the successor or the sale that is viewed as the cause of the "destruction of ... remedies"? If it is the sale, then bankruptcy warrants no blanket exemption. Nieves, the companion case to Ramirez, indicates that it is the *290 acquisition or transfer and not the particular acquirer that triggers liability. There the immediate purchaser of the manufacturer's assets, as well as a subsequent purchaser,[7] were both held potentially liable as successors. Clearly, the final purchaser did not cause the destruction of remedies against the original owner-manufacturer; but the transfer or acquisition or both destroyed such remedy. Responding to the argument that the first Ray justification is concerned solely with finding one viable defendant, the New Jersey Supreme Court said:
In so arguing [the intermediate owner] misinterprets the underlying purpose of this justification for the imposition of successor corporation liability. In Ray v. Alad, supra, the court was concerned not as much with the availability of one particular viable successor as it was with the unavailability of the original manufacturer by reason of its divestiture of assets and dissolution. [Ramirez, supra, 86 N.J. at 370-371.]
This language is strong evidence that our Supreme Court sees the transfer of assets and the manufacturer's unavailability to answer in damages[8] as the triggering circumstances and not the precise role of the transferee nor the form of the transfer.[9]
The Ninth Circuit has indeed taken a restrictive view of the first Ray justification, interpreting Ray to require proof that the alleged "successor" itself caused or contributed to the predecessor's demise. See, e.g., Nelson v. Tiffany Industries, Inc., 778 F.2d 533 (9 Cir.1985):
It is our view that the California Supreme Court's decision in Ray does not apply where there is a good faith dissolution in bankruptcy which is not *291 intended to avoid future tort claims against the predecessor. Under such circumstances, the successor corporation has not contributed to or caused the destruction of the plaintiff's remedies. On the record before us, however, it is not clear whether the district court considered the evidence offered by the plaintiff for the purpose of showing that Moody filed its petition pursuant to a collusive agreement with Tiffany. If the evidence shows that Tiffany induced Moody to file for bankruptcy to avoid future tort liability, the Ray exception to the general rule would be applicable. Because this critical factual issue was not considered or resolved by the district court, we must reverse the order granting summary judgment. [at 538.]
A trial court in the Third Circuit has criticized that view, finding that the California federal court in Nelson v. Tiffany "may have read the Ray criteria too narrowly by holding that [the] successor must have caused the loss of remedy...." Conway v. White Trucks, 692 F. Supp. 442, 453 (M.D.Pa. 1988). Under Ramirez, the destruction of plaintiff's remedy against the manufacturer occurs by virtue of the transfer of the assets of the product line, combined with the manufacturer's effective dissolution and the purchaser's continuation of the product line. The purchaser need not do more to satisfy the first Ray factor.
The second Ray justification, "the successor's ability to assure the original manufacturer's risk-spreading role," suggests no reason why a purchaser in bankruptcy is any less able to insure against contingent products liability claims than any other purchaser. Our Supreme Court has clearly expressed the intention to allow persons injured by defective products to recover against those who can best spread the risk of such injury. Ramirez, 86 N.J. at 350.
Finally, the third Ray justification is "the fairness of requiring the successor to assume a responsibility for defective products that was a burden `necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.'" Id. at 349, quoting Ray. Whatever arguments can be made under this justification would seem to turn on the nature of the "good will," and the extent to which it was actually "enjoyed by" the successor. It may be argued that a debtor in bankruptcy has less good will than a viable corporate seller, but that raises a fact question *292 that has to be analyzed on a case-by-case basis. It does not warrant the conclusion that a purchase in bankruptcy per se precludes successor liability. The New Jersey Supreme Court apparently found it "fair" to allow successor liability against one who purchases all or virtually all the assets of a business and who continues the product line.
One commentator, recommending the "product line continuity theory," implies that successor liability does not require transfer of all of the assets, but only those associated with the product line in issue. See Phillips, "Product Line Continuity and Successor Corporation Liability," 58 N.Y.U.L.Rev. 906, 917, 924 (1983).
Plaintiff alleges that defendant COPCO purchased all or virtually all of defendant C.O. Porter's assets and continued to produce the offending product line. Defendant submits, by way of affidavit,[10] the conclusory and hearsay statement of its president, that
Although I am without personal knowledge as to the percentage of assets COPCO, Inc., purchased from C.O. Porter Machinery Co., I am certain that C.O. Porter Machinery Co. sold a substantial portion of its assets to other entities, either shortly before or at around the same time as the bankruptcy.
This is insufficient to establish anything other than the virtually total transfer of assets. The purchase agreement, quoted above, seems to show a transfer of most assets to COPCO. To the extent the parties' papers suggest a question of whether defendant COPCO did purchase "all or substantially all" of C.O. Porter's assets, this is a fact question that cannot be resolved by summary judgment.
Nothing in Ramirez or Nieves supports the argument that a transfer in bankruptcy is to be shielded from exposure to successor liability.
*293 Defendant argues that bankruptcy law protects it in two respects. Despite the facial appeal of defendant's arguments, this court finds that neither applies.
First, defendant relies upon the order approving the sale of C.O. Porter's assets to COPCO:
The property is sold free and clear of all liens, claims (absolute or contingent) and encumbrances, with the interest of any parties asserting liens therein and claims and/or encumbrances thereon attaching to the proceeds thereof with the same validity and in the same order of rank and priority as said liens, encumbrances and claims now exist in said property.
That order is authorized by 11 U.S.C.A. § 363(f), which provides:
The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if  [inter alia]
(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest....
This section applies only to property subject to identifiable interests or liens of others, such as mortgagors, secured creditors, taxing authorities and the like. It is a condition or qualification of the general powers of the trustee in bankruptcy (under § 363(b) and (c)) to sell property of the estate. In other words, the trustee is generally permitted to sell property of the estate (under conditions not relevant here), except that if there is a specific interest of another in that property (not merely a general claim against the estate), the property can nevertheless be sold "free and clear" of the interest if nonbankruptcy law (including state law) would permit it.
It is apparent that § 363(f) does not address any of the issues directly involved in this case. The order issued under that section can only protect the purchaser of estate property against "any interest in such property." Plaintiff does not claim an interest in the purchased property, and the order does not affect plaintiff's claim against COPCO. See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc., 75 B.R. *294 944, 948 (Bankr.N.D.Ohio 1987).[11]
Defendant further argues that plaintiff's claim, as part of a class of contingent claims identified in the course of the bankruptcy proceedings, was discharged as to C.O. Porter, and therefore cannot proceed against any purchaser of C.O. Porter's assets. However, where the corporate debtor does not survive and the "reorganization" becomes a liquidation, the order confirming the debtor's liquidation plan does not, in fact, discharge the debtor corporation. See 11 U.S.C.A. § 1141(d)(3). Additionally, 11 U.S.C.A. § 524(e) explicitly provides that:
discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.
The disjunctive language of § 524(e) calls attention to an obvious difference between the successor's general liability for a debt of the seller, and an actual lien on the property acquired. No one in this case alleges that the property acquired was encumbered by any statutory or common law lien.
This section was apparently intended to make it clear that the obligations of a joint debtor, guarantor or surety would not be excused by the debtor's discharge. It is equally applicable to "any other entity" whose liability is secondary or vicarious.
When it is necessary to commence or continue a suit against a debtor in order, for example, to establish liability of another, perhaps a surety, such suit would not be barred. Section 524(e) was intended for the benefit of the debtor but was not meant to affect the liability of third parties or to prevent establishing such liability through whatever means required. [3 Collier, Bankruptcy (15 ed. 1988), § 524.01(3); footnotes omitted.]
One bankruptcy court has ruled contrary to this court's decision, at least where a reorganization occurred in bankruptcy. Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944 (Bankr.N.D. Ohio, 1987). The court in White was asked to enjoin a state court products liability suit on facts similar to ours. There, the *295 injury occurred within days after the bankruptcy sale of assets, but before confirmation of the debtor's plan for reorganization. That court held that preemption precluded a state court suit. In the instant case, a plan for liquidation, and not reorganization, was confirmed.[12]
The Ohio bankruptcy court also found that § 1141 (which defines a discharge under the code) precludes successor liability because the underlying liability has been discharged. That appears to be faulty reasoning. Section 1141(c), 11 U.S.C.A. § 1141(c), does not hold the purchaser harmless; it only frees the property from "claims and interest of creditors, equity security holders, and of general partners in the debtors." Even more significantly, § 1141(d)(3) explicitly provides that confirmation of a plan of liquidation (by contrast to reorganization) does not discharge a corporate debtor that discontinues business. Finally, § 1141(d)(1)(A) provides that the confirmation of a plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation...." Contrary to the White court, I do not find that that section discharges an unknown claim that was not a "debt" at the time.
The Fifth Circuit has held that, even if a bankruptcy proceeding could be reopened[13] to allow a products liability claim to be filed against the debtor, that jurisdiction would not extend to a claim based on an accident that occurred after the order approving the sale of assets. See In re Mooney Aircraft, Inc., supra, 730 F.2d at 373.
An accident that is waiting to happen because of a defective product in circulation is not very different from past exposure *296 to a toxin that may manifest injury in the future. For a persuasive argument against discharging unaccrued toxic tort claims that arise from prepetition activities of a debtor in reorganization, see Bibler, "The Status of Unaccrued Tort Claims in Chapter 11 Bankruptcy Proceedings," 61 Am.Bankr. L.J. 145 (1987). Cf. Zulkowski v. Consolidated Rail Corp., 852 F.2d 73 (3d Cir.1988) (former railroad that was not liquidated but reorganized in bankruptcy was not absolved of liability under FELA for asbestosis manifested after the reorganization).
In a case involving the same debtor as the Chambersburg case, a Pennsylvania federal district court reversed itself last year to deny plaintiffs the benefit of successor liability based upon the findings of the Ohio bankruptcy court. Conway v. White Trucks, Division of White Motor Corp., 692 F. Supp. 442 (M.D.Pa. 1988). The court recognized that the "product line" exception set forth in Ramirez had been adopted as the law of Pennsylvania, despite the district court's criticisms of that theory. Id. at 451-452. However, on reconsideration, the federal court distinguished Conway from Ramirez on its facts. White, the manufacturer, had come out of reorganization and was functioning. It had sold only the truck line involved in plaintiff's accident to Volvo. There had been insurance for such claims. The reorganization plan had provided a fund for individuals such as plaintiffs and the bankruptcy court had approved widely published notices to claimants of the deadlines for filing proofs of claims. Thus, the court implicitly found against plaintiffs because of a failure of the first and third Ray justifications for successor liability.
Volvo-White had little or nothing to do with the loss of the Plaintiffs' remedies against White Motor Corporation. While it is true that Plaintiffs' remedies against White Motor Corporation would have probably been lessened as a result of the bankruptcy proceedings, there is nothing in the record to establish that those remedies would be non-existent or severely restricted had a timely proof of claim been filed. To the contrary, the record clearly reflects that there was available insurance coverage and a special fund was set aside in the course of the reorganization to accommodate those in the position of the Plaintiffs. Sadly, however, the Plaintiffs for whatever reason lost their opportunity to take *297 advantage of those measures by failing to timely file a Proof of Claim. [Conway v. White Trucks, supra, 692 F. Supp. at 452.]
Conway and Chambersburg are distinguishable on their facts.
The Third Circuit has held that where an antitrust cause of action accrued prior to the reorganization consummation order (under the former Bankruptcy Act, 11 U.S.C.A. § 1 et seq., July 1, 1898, 30 Stat. 544, c. 541) that claim is discharged against the debtor and cannot be the subject of a subsequent suit against the reorganized corporation. In re Penn Central Transp. Co., 771 F.2d 762, 767 (3 Cir.1985). Compare Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, 942 (3 Cir.1985), cert. den. 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), where the circuit held that asbestos-related diseases which did not reveal themselves until after the consummation of reorganization were not "claims," were not discharged, and that injured railroad employees can sue even the reorganized corporation.
In the Penn Central decision, the court considered the due process implications of the kind of notice the claimants had. While the antitrust claimants tried unsuccessfully to distinguish themselves from "ordinary commercial" claimants, 771 F.2d at 768, clearly the notice that is fair to such entities is not necessarily so to an injured employee. More important, it was the reorganized corporation that emerged from the bankruptcy that was expressly protected by the discharge in the Penn Central case. That holding is not inconsistent with this court's ruling.
In a case similar to Penn Central, a bankruptcy court in Georgia denied successor liability. In re All American of Ashburn, Inc., 56 B.R. 186 (Bankr.N.D.Ga. 1986), aff'd on other grounds, 805 F.2d 1515 (11 Cir.1986) (damage arose after the petition but before the order approving sale). There are significant differences between All American and this case. There the individuals seeking to recover against the purchaser of the debtor's assets were actually aware of the pending bankruptcy proceeding and filed no claim therein. Instead, they went to state court, where defendants lost a motion for summary judgment *298 brought on account of the bankruptcy order of sale. The bankruptcy court in All American thereafter granted an injunction against plaintiffs' pursuing a state court action, saying it was plaintiffs' own fault that they received no notice of the sale of assets. The court distinguished In re Schweitzer, supra, and Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.), 730 F.2d 367 (5th Cir.1984) (personal injury suit arising out of air crash years after the bankruptcy sale of assets could not be enjoined by bankruptcy court). The Georgia bankruptcy court then unequivocally held that:
its Orders approving the sales of assets to ALS are final and not subject to collateral attack. [56 B.R. at 190.]
All American went through reorganization, not liquidation. Thus, All American turns on several distinguishing factors: timing, the claimant's actual knowledge of the bankruptcy, and the confirmation of a reorganization plan.[14] However, to the extent it turns on a finding that an order approving sale under 11 U.S.C.A. § 363 on its face bars successor liability, this court disagrees.
Defendant argues that this plaintiff, whose injury predated a bankruptcy order that allowed notice of claims like plaintiff's and actually provided a formula for partial satisfaction of such claims, cannot recover because he filed no such notice of claim.[15] But see In re Harbor Tank Storage Co., 385 F.2d 111 (3d Cir.1967) (creditor's actual knowledge of the pendency of the *299 reorganization case does not impose an affirmative obligation on the creditor to file a claim where no notice was given by the trustee). However, defendant presents no evidence that plaintiff would have recovered any sum, much less the full measure of his damages, by filing. If anything, these facts emphasize that bankruptcy epitomizes the destruction of plaintiff's remedies against the original manufacturer. To the extent that successor liability was adopted as an intentional expansion of the protection afforded to those persons injured by defective products whose manufacturers are no longer in business, bankruptcy presents a stronger and not a weaker case for its application.
One might question whether purchasers in bankruptcy should be subject to the differing laws of the 50 states on successor liability, or whether bankruptcy sales require uniformity on this issue. However, assets sold in bankruptcy are routinely subject to mortgages, security interests and other liens determined by the laws of the several states, without unduly interfering with the administration of the bankruptcy law or infringing on the supremacy of federal law.
The bankruptcy court in the District of New Jersey has laid out the constitutional basis for the preemption doctrine in Matter of Borne Chemical Co., Inc., 54 B.R. 126 (Bankr.D.N.J. 1984):
The United States Constitution, Article VI, clause 2, provides in pertinent part that "[t]his Constitution, and the Laws of the United States, which shall be made in pursuance thereof ... shall be the supreme Law of the Land ..." The Constitution, Article 1, § 8, clause 4 authorizes Congress [t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." The present Federal Bankruptcy Law is derived from the above grant of authority. [at 129.]
Citing Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) and Pacific Gas and Electric Co. v. State Energy Resources Conservation and Development Comm'n., 461 U.S. 190, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983), the *300 bankruptcy judge in Borne described the test applicable here.[16] That is whether, after determining the purpose of the Bankruptcy Code and the state law, the state law as applied will have "the effect of interfering with the objectives underlying the federal law." 54 B.R. at 129-130. Borne held that ECRA was not preempted by the code.
The two major purposes of the code, according to Borne, are: (1) to effect a fair and equitable distribution of the debtor's property among its creditors, and (2) to enable debtors to get a "fresh start". Id. at 131. Neither purpose is derogated by including bankruptcy sales within the Ramirez doctrine. See also Midlantic National Bank v. N.J. Dept. of Environmental Protection, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (a trustee in bankruptcy cannot abandon property in contravention of a state law, specifically ECRA, reasonably designed to protect public health or safety from an identified hazard).[17]
Nothing about the application of successor liability to this case conflicts with the bankruptcy orders involving C.O. Porter's estate or sale to COPCO. Nor does the availability of successor liability have the potential for such conflict or interference in other cases. Thus, there is no preemption problem that would preclude Ramirez from applying here.
Defendant may be implicitly arguing that the third Ray factor, fairness, is not met in the circumstances of this case. Certainly defendant's liability under Ramirez, if any, is entirely vicarious. Plaintiff's proofs on his strict liability claims would go to the design, manufacture or inadequate warnings provided *301 by the bankrupt manufacturer, C.O. Porter. Plaintiff does not allege that the purchaser of the assets did, or failed to do, anything that contributed to his injury. But that is equally true in Ramirez, Nieves and Ray. Defendant does not claim that this plaintiff recovered for any of his injury from the estate in bankruptcy, or even that plaintiff had notice of the bankruptcy proceeding in order to file a claim.
Successor liability is, by definition, vicarious liability, and defendant points to no essential difference created by the bankruptcy or the timing of plaintiff's accident. Successor liability as described by Ramirez is a form of secondary, vicarious liability. In other words, COPCO's liability turns on its relationship to the original manufacturer, and not on its own acts or omissions with regard to the product. In every form of vicarious liability, the blameworthy behavior or status of the primarily liable person must be established as a prerequisite to recovery against the secondarily liable person. However, there are several circumstances where the primarily liable defendant is insulated in some way from judgment (even by discharge in bankruptcy) without destroying the right to recover against the secondarily liable person.
Perhaps the most troublesome aspect of the "product line" theory of successor liability is that in most cases of vicarious liability, the secondarily liable party has a direct relationship to the obligee. This is true, for example, in the case of a guarantor's liability on a loan, a surety's on a contract, and a principal's responsibility for the acts of an agent who has either been authorized or given apparent authority to act on the principal's behalf. Closer examination of Ramirez reveals that the Court implicitly found the "successor's" role in acquiring the assets and product line, and in taking advantage of the predecessor's good will and product development, to be sufficient substitutes for direct contact with third-person claimants.
Where an injury occurs prior to the closing of a bankruptcy proceeding, and the injured party seeks to have its claim *302 adjudicated, it appears there is discretion in the district court in which the bankruptcy is pending to: hear the case, refer it to the bankruptcy court, order it heard in the district court where the claim arose,[18] or abstain and allow the claim to proceed in state court. See generally 28 U.S.C.A. § 157, § 1334, § 1471. See also Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940) (abstention under 28 U.S.C. § 1334(c)).
In the present case, the injury did occur prior to the approval of the debtor's liquidation plan and the closing of the bankruptcy case. We must ask two questions: (1) was plaintiff required to seek adjudication of this claim in the federal district court? (2) Does the answer to the first question depend upon actual notice to plaintiff of the bankruptcy proceeding, or is plaintiff charged with notice? Both must be answered in the negative.
On the facts here, due process requires more than publication to cut off an injured employee's right to pursue a products liability claim against a successor to the assets and product line of the manufacturer. See generally Mullane v. Central Hanover Trust Co., 339 U.S. 306, 315-17, 70 S.Ct. 652, 657, 94 L.Ed. 865, 874-75 (1949). An employee who is injured by machinery on the job has little reason to know the status of the manufacturer of that machinery, or to read the journals where "notices" may be published. At the time plaintiff was injured in August 1984, COPCO had already purchased the *303 assets of C.O. Porter. A chapter 11 (reorganization) proceeding was pending. By May 1985, reorganization had apparently been abandoned and a plan of liquidation was approved. It was that plan that attempted to provide for partial payment on personal injury claims such as plaintiff's. See footnote 3 above. There is no record that anyone gave notice of the bankruptcy proceeding to plaintiff. That may be because plaintiff had not yet filed suit. Due process would appear to require more before terminating rights against the successor.
Federal law grants non-exclusive jurisdiction to the district court and its bankruptcy court. By providing in 28 U.S.C.A. § 157 for the district court itself to decide whether and where to hear the case, we must ask whether Congress has preempted the choices of jurisdiction and venue, or whether there is room for this state court to make that decision. Where abstention is discretionary, concurrent state court jurisdiction is contemplated. See 28 U.S.C.A. § 1334(c); Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). The exercise of that jurisdiction, in the absence of a conflicting federal court decision, is therefore not preempted. Here, defendant COPCO has never sought to remove the matter to the federal court, nor has it sought relief in the bankruptcy court where the petition was filed. In fact, defendant's letter brief of March 29, 1989, argues that
... the question of jurisdiction raised by the court has already been settled and that having discharged the bankrupt and provided for claims of this nature, the Bankruptcy Court has no further jurisdiction in this matter.
An extensive analysis of bankruptcy jurisdiction and procedure is beyond the scope of this decision. However, this court is satisfied that it is not overstepping the limits set by the Supremacy Clause in allowing the New Jersey case to proceed.
This denial of summary judgment does not constitute a finding that defendant COPCO is liable as a successor for any products liability claim plaintiff may be able to prove. Plaintiff still bears the burden of proof with respect to this defendant's status. As a mixed question of law and fact, successor status *304 is for the court and not a jury. Cf. Lopez v. Swyer, 62 N.J. 267, 272, 275, n. 3 (1973) (applicability of discovery rule).[19]
NOTES
[1] The "product line" theory of successor liability is a minority position, applicable only in a few states, including New Jersey, California, Pennsylvania, and, arguably, Massachusetts and Colorado. See Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977); Dawejko v. Jorgensen Steel Co., 290 Pa.Super. 15, 434 A.2d 106 (1981); Roy v. Bolens Corp., FMC, 629 F. Supp. 1070 (D.Mass. 1986), citing slip opinion in Perez v. Amsted Industries, Inc., No. 57728 (Mass. Superior Ct., April 20, 1984); and Hickman v. Thomas C. Thompson Co., 592 F. Supp. 1282 (D.Colo. 1984) (predicting Colorado Supreme Court would adopt the "product line" theory of successor liability).
[2] In exchange for the payment of $335,000 in cash, defendant COPCO received all of C.O. Porter's inventory, engraving drawings, manufacturing records and documents, sales materials, including customer lists, manufacturing equipment, trademarks, copyrights and trade names, except for those related to certain woodworking equipment not connected with the product line in this case. The corporate name was not included in the sale. The purchase agreement purports to list all known litigation. Since the agreement was dated February 28, 1983, it could not have listed any suit related to the August 1984 accident.
[3] The amended plan for liquidation provided for a class of products liability tort claims, "class 7," defined as:

This class consists of all unliquidated claims held by persons or entities having claims against the Debtor as a result of injuries related to equipment and/or parts and accessories manufactured and/or repaired by the Debtor. Holders of these claims consist of both personal injury plaintiffs, and other co-defendants of the Debtor claiming subrogation, indemnification, and/or contribution from the Debtor. Claims for subrogation, indemnification, and/or contribution are included within this class, notwithstanding the fact that such claims may be subject to disallowance or subordination under Sections 502(e), 509(c) and 510 of the Code. Such class includes all claims whether they are related to insured or uninsured injuries.
Total assets of $370,000 were to be used to pay off, on a fractional basis, the class-7 claims.
[4] The May 2, 1985 order provides, in part,

IT IS FURTHER ORDERED that upon entry of this Order, the automatic stay is hereby lifted and personal injury plaintiffs whose claims are covered by insurance are free to prosecute their causes of action in the court of competent jurisdiction, but that their sole recovery shall be from such insurance.
There is no insurance coverage for plaintiff's accident.
[5] There is an underlying concern in any corporate bankruptcy that the debtor not be able to walk away from its debts and allow an alter ego to acquire the benefits of the business with none of the burdens. This is a proper focus of examination by a bankruptcy court before approving a sale of the bankrupt's assets. At least one court has recognized the right of a plaintiff seeking to recover on successor liability to reexamine the characteristics of the purchase long after the bankruptcy court order approving that sale. See Nelson v. Tiffany Industries, Inc., 778 F.2d 533, 538 (9 Cir.1985) (applying California law). But see In re All American of Ashburn, Inc. 56 B.R. 186, 190 (Bankr.N.D.Ga. 1986), aff'd on other grounds 805 F.2d 1515 (11 Cir.1986).
[6] Neither Ramirez, Nieves nor Ray explicitly addresses the case where the acquisition is part of the business or business assets, such that the alleged successor continues the product line involved in the inquiry but not all of the business of the predecessor. In Kline v. Johns-Manville, 745 F.2d 1217 (9 Cir.1984), the court held that California's successor liability does not apply to the partial acquisition of an asbestos line of a manufacturer who filed for a reorganization 20 years later.
[7] In Nieves it was the intermediate purchaser who challenged successor liability.
[8] Where the predecessor continues to be a viable entity, the first Ray justification would be nullified. LaPollo v. General Electric Co., 664 F. Supp. 178, 184 (D.N.J. 1987) (applying New Jersey law, and holding that, "the New Jersey Supreme Court ... would decline to impose liability on [the purchaser of a product line] in light of GE's continued viability.")
[9] Justice Schreiber's concurring opinion in Ramirez, however, stresses the successor's role:

The central thesis of this methodology is premised on the elimination by the successor of an effective remedy. [86 N.J. at 358.]
[10] The affidavit of John Northway dated August 10, 1988 is attached to defendant's notice of motion filed August 12, 1988.
[11] The court in Volvo White Truck Corp. v. Chambersburg Beverage, Inc., recognized that the Ramirez rule employs "successor liability ... to prevent avoiding product liability by a sale of assets." Id. at 950.
[12] The court in Volvo White stated:

... the issue to be decided is whether state successor liability law is preempted by federal law to the extent the claims underlying the successor's liability have been discharged under a plan of reorganization. [75 B.R. at 950.]
[13] 11 U.S.C.A. § 350 permits reopening under limited circumstances.
[14] All American is based in part upon the theory that successor liability interferes with the priority of claims under the Bankruptcy Code. That is a misconception. The source of the injured plaintiff's recovery, if allowed, will be the one who acquired the product line. This does not diminish the recovery of others whose claims are in a different class.
[15] If plaintiff had been aware of the bankruptcy and filed a claim; and if the bankruptcy court had estimated the value of the contingent claim as it can under 11 U.S.C.A. § 502(c)(1); and if the plaintiff's unsecured claim had been paid at some fraction of its value along with other unsecured debts; the court's ruling would be consistent with such a plaintiff seeking successor liability to provide a complete remedy.
[16] Borne determined that the Bankruptcy Code did not preempt a New Jersey statute, the Environmental Cleanup Responsibility Act ("ECRA"). We are concerned with New Jersey common law of successor liability, rather than with a state statute.
[17] Midlantic did not arise under § 363(f) or § 524(e) of the Bankruptcy Code, but rather under § 554(a), permitting the trustee to abandon certain property.

It can be argued that Ramirez is reasonably designed to protect health or safety from an identified hazard as well: the defective product.
[18] This alternative (28 U.S.C.A. § 157(b)(5)) suggests choice of law relevant to the successor liability issue.

The Michigan district court could have ordered a claim such as plaintiff's to be heard in the District of New Jersey, or could have abstained in favor of the New Jersey court proceeding. Whether New Jersey's law of successor liability would apply is a choice of law question which was never raised in this New Jersey lawsuit. Michigan follows the "continuity of enterprise" theory of successor liability. See Turner v. Bituminous Cas. Co., 397 Mich. 406, 244 N.W.2d 873 (1976). Ramirez rejects the Turner approach. 86 N.J. at 347.
[19] The procedure described in Conway v. White Trucks, supra, 692 F. Supp. at 447 makes sense. There "the parties agreed to adjudicate the Plaintiffs' successor liability claim without a jury" prior to trial of the products liability claim itself.